# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAUL STRONG, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>PRATT & WHITNEY DIVISION; QUEST GLOBAL SERVICES-NA, INC.; BELCAN LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC.; and AGILIS ENGINEERING, INC.,<br><br>               Defendants. | **CIVIL ACTION NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I. NATURE OF ACTION .................................................................................... 1

II. JURISDICTION AND VENUE ...................................................................... 5

III. PARTIES ........................................................................................................ 6

    A. Plaintiff ................................................................................................ 6

    B. Defendants ........................................................................................... 6

IV. AGENTS AND CO-CONSPIRATORS ......................................................... 8

V. TRADE AND COMMERCE ........................................................................ 11

VI. FACTUAL ALLEGATIONS ........................................................................ 11

    A. Background on the Market for Aerospace Enginnering Services in
the United States ................................................................................ 11

    B. Defendants' Illegal No-Poach Agreement. ........................................ 13

        1. Department of Justice Investigation and Criminal
Indictments. ........................................................................... 13

        2. Defendants' Anticompetitive Scheme. ................................... 14

        3. Patel Orchestrated and Enforced the No-Poach Agreement. ................ 15

        4. Pratt & Whitney Further Restricted Hiring ........................... 19

            a. The Two-Year Tenure Restriction. ............................ 19

            b. The Hiring Freezes. ................................................... 20

        5. Defendants Were Fully Aware Their Conduct Was
Unlawful ................................................................................ 23

        6. Plus Factors Render the Aerospace Enginnering Industry
Susceptible to Collusion ....................................................... 24

    C. Anticompetitive Effects and Injury Suffered by Class Members
from Defendants' Illegal No-Poach Agreement ................................ 26

VII. CLASS ACTION ALLEGATIONS .............................................................. 27

VIII. PLAINTIFF'S CLAIMS ARE TIMELY ...................................................... 29

IX. CLAIM FOR RELIEF .................................................................................. 32

i

Plaintiff Paul Strong ("Plaintiff"), by and through his undersigned counsel, brings this lawsuit on behalf of himself and all others similarly situated against Pratt & Whitney Division ("Pratt & Whitney"); QuEST Global Services-NA, Inc. ("QuEST"); Belcan LLC ("Belcan"); Cyient, Inc. ("Cyient"); Parametric Solutions, Inc. ("Parametric") and Agilis Engineering, Inc. ("Agilis") (collectively, "Defendants"), for claims under the Sherman Act to recover damages and other relief for the substantial injuries he and others have sustained arising from Defendants' anticompetitive conduct. The allegations herein are based upon Plaintiff's personal knowledge as to matters relating to himself and upon information, belief, and the investigation of counsel as to all other matters.

## I.     NATURE OF ACTION

1.     This action challenges under Section 1 of the Sherman Act a no-solicitation and no-hiring agreement, combination, or conspiracy among Defendants pursuant to which each agreed not to recruit or hire each other's employees without prior approval (the "No-Poach Agreement" or "Conspiracy"). Beginning at least by 2011 and continuing until at least 2019, senior executives and managers at Defendants restrained competition in the labor market for employees—principally engineers and other skilled aerospace workers[1] ("Skilled Aerospace Workers")—by suppressing job mobility and compensation.

2.     Plaintiff Strong is a former employee of Defendant Pratt & Whitney, one of the largest aerospace engine design, manufacture, and service companies in the United States, and brings this suit individually and on behalf of a proposed Class of similarly-situated employees to recover damages and to prevent Defendants from retaining the benefits of their antitrust violations.

---

[1] Other skilled aerospace workers include, but are not limited to, engineering technicians, instrumentation technicians, quality technicians, machinists, welders, and mechanics.

3.      Defendants include five outsource engineering supply companies (the "Supplier Defendants") whose employees performed work for Pratt & Whitney on a project basis. The Supplier Defendants include QuEST, Belcan, Cyient, Parametric, and Agilis. The Supplier Defendants all employed Skilled Aerospace Workers to perform outsourcing projects for Pratt & Whitney.

4.      Defendants successfully concealed the No-Poach Agreement's existence for years. It was only recently that the Conspiracy was first revealed publicly, when on December 9, 2021, the U.S. Department of Justice ("DOJ") unsealed a criminal complaint against Mahesh Patel ("Patel"), a former Manager and (later) Director at Pratt & Whitney. According to the criminal complaint, Patel "served as a leader and primary enforcer of this agreement" that "allocate[d] victim-employees in the labor market in the aerospace industry working on projects for [Pratt & Whitney], specifically by agreeing to restrict the hiring and recruiting of engineers and other skilled-labor employees." *See* Affidavit in Support of Criminal Compl. and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-1189, ECF No. 15 (D. Conn. Dec. 9, 2021) ("DOJ Affidavit") ¶ 11.

5.      Less than a week later, on December 15, 2021, the DOJ revealed a grand jury indictment against Patel and five of his co-conspirators: Robert Harvey ("Harvey"); Harpreet Wasan ("Wasan"); Steven Houghtaling ("Houghtaling"); Tom Edwards ("Edwards"); and Gary Prus ("Prus"). *See* Indictment, *United States v. Patel, et al.*, No. 3:21-cr-220 (D. Conn. filed Dec. 15, 2021) Dkt. 20 ("DOJ Indictment"). In announcing the DOJ Indictment, Assistant Attorney General Jonathan S. Kanter of the DOJ's Antitrust Division said, "Our investigation revealed a prolonged and widespread scheme to deprive aerospace workers of the ability to plan their own careers and earn competitive pay."

2

6.      According to the DOJ Indictment, Defendants and co-conspirators recognized the mutual financial benefit of the conspiracy – namely, reducing the rise in labor costs that would occur when Skilled Aerospace Workers were free to find new employment in a competitive environment.

7.      To carry out this Conspiracy, the DOJ alleges that by 2011 the six aerospace executives and managers, along with unindicted co-conspirators, orchestrated the illegal No-Poach Agreement with one another to restrict the hiring and recruiting of Skilled Aerospace Workers. Defendants and their co-conspirators attended meetings and engaged in discussions between and among themselves to execute the No-Poach Agreement. They further agreed during those meetings and discussions to restrict the hiring and recruiting of Skilled Aerospace Workers between and among the Supplier Defendants.

8.      For example, as shown in a January 2017 email, Patel emailed Prus at Parametric and instructed "Please do not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." Similarly, in March 2016, in the course of discussing Patel's hiring restrictions with an executive of another Supplier, Prus wrote: "MAHESH says he does not want the salaries to increase."  The financial rationale for the illegal No-Poach Agreement was clear.

9.      As outlined in the criminal case against Patel, Defendants entered into an unlawful horizontal conspiracy at the highest levels of their organizations, through verbal agreements that were later confirmed by conduct and in emails, which they concealed from the public and their respective employees who make up the proposed Class. As described below, Defendants' senior executives periodically monitored and reaffirmed the No-Poach Agreement.

10.     The No-Poach Agreement manifested in interwoven and overlapping hiring and recruiting restrictions, all of which had the common purpose of limiting competition for, and thereby restricting the free movement and compensation of these specific Skilled Aerospace Workers. The No-Poach Agreement thus artificially extended Skilled Aerospace Workers' tenure with a given Defendant and reduced or eliminated their ability to advocate and obtain better terms of employment, including compensation, at current and future employers.

11.     The agreement among Defendants was not justified by any legitimate or lawful business purpose. Instead, it was an effective tool to suppress their employees' mobility and compensation, and hence unlawfully reduce Defendants' costs. Indeed, Pratt & Whitney's incentive was to reduce the cost of contracts with each of its suppliers by helping those suppliers reduce their labor expenses. It did so by orchestrating and enforcing a horizontal agreement between and amongst the suppliers not to compete for Skilled Aerospace Workers.

12.     The conspiracy accomplished its purpose. It reduced competition, distorted the efficient allocation of labor, and suppressed the compensation of Defendants' employees below competitive levels. This No-Poach Agreement was intended to, and did, suppress the job mobility of and compensation to Plaintiff and the members of the proposed Class (defined below) below the levels that would have prevailed but for the illegal No-Poach Agreement.

13.     In a properly functioning and lawfully competitive labor market, Defendants would compete with one another to attract and retain employees. This competition for prospective employees would determine the level of compensation. Labor market competition creates negotiating leverage for workers, which in turn leads to higher wages and greater mobility.

14.     Instead, in this case, Defendants prevented that competition through their illegal Conspiracy, apparently concluding that the profits to be made by suppressing wages in the labor market outweighed the benefits to be gained from competing with each other in the labor market.

15.     The No-Poach Agreement, and the anticompetitive agreements between and among Defendants and co-conspirators in furtherance thereof, are and were naked restraints of trade that constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The No-Poach Agreement, and the agreements and conduct by Defendants and co-conspirators in furtherance thereof, had the purpose and effect of unlawfully limiting Plaintiff's and Class members' job mobility and suppressing their compensation below the levels that would have been available absent the No-Poach Agreement.

## II.     JURISDICTION AND VENUE

16.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

17.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

18.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) hired and employed individuals throughout the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

20.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

21.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.     PARTIES

#### A.     Plaintiff

22.     Plaintiff Paul Strong is a citizen and resident of Florida. Plaintiff worked as an Engineer (with various titles including Senior Engineer and Staff Engineer) for Pratt & Whitney from 1992 until he retired in 2019. As a result of Defendants' conspiring through the No-Poach Agreement, Plaintiff was injured through suppressed job mobility and compensation.

#### B.     Defendants

23.     Defendant Pratt & Whitney is a subsidiary of Raytheon Technologies Corporation and is incorporated in Delaware with its principal place of business in East Hartford, Connecticut. Pratt & Whitney is one of the largest aerospace engine design, manufacture, and service companies in the United States. It employs approximately 39,000 employees, and in 2020, earned approximately $16.8 billion in revenue. During the relevant period, Pratt & Whitney participated

in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

24.     Defendant QuEST Global Services-NA, Inc. ("QuEST") is an Ohio corporation with a principal place of business in East Hartford, Connecticut. It was one of the suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis. It competed with Pratt & Whitney and other Supplier Defendants with respect to the recruitment and retention of Skilled Aerospace Workers. It employs approximately 13,000 employees worldwide, and in 2021, had revenues of $600 million. During the relevant period, QuEST participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

25.     Defendant Belcan Engineering Group, LLC ("Belcan") is an Ohio corporation with a principal place of business in Windsor, Connecticut. It was one of the suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis. It competed with Pratt & Whitney and other Supplier Defendants with respect to the recruitment and retention of Skilled Aerospace Workers. It employs approximately 10,000 employees worldwide and had recently reported revenue at $739.63 million. During the relevant period, Belcan participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

26.     Defendant Cyient, Inc. ("Cyient") is a California corporation with a principal place of business in East Hartford, Connecticut. Prior to 2014, Cyient was known as Infotech Enterprises Ltd. It was one of the suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis. It competed with Pratt & Whitney and other Supplier Defendants with respect to the recruitment and retention of Skilled Aerospace Workers. It employs approximately 10,000

7

employees worldwide, and in 2018, reported revenues of $570 million. During the relevant period, Cyient participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

27.    Defendant Parametric Solutions, Inc. ("Parametric") is a Florida corporation with a principal place of business in Jupiter, Florida. It was one of the suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis. It competed with Pratt & Whitney and other Supplier Defendants with respect to the recruitment and retention of Skilled Aerospace Workers. It employs approximately 300 employees worldwide and recently reported revenues of approximately $42 million. During the relevant period, Parametric participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

28.    Defendant Agilis Engineering, Inc. ("Agilis") is a Florida corporation with a principal place of business in Palm Beach Gardens, Florida. It was one of the suppliers whose employees worked on projects for Pratt & Whitney on an outsource basis. It competed with Pratt & Whitney and other Supplier Defendants with respect to the recruitment and retention of Skilled Aerospace Workers. It employs approximately 41 employees worldwide and reported revenue of $3.28 million. During the relevant period, Agilis participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

## IV.    AGENTS AND CO-CONSPIRATORS

29.    Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

30.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

31.    Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

32.    Defendants' agents operated under the explicit and apparent authority of their principals.

33.    Mahesh Patel ("Patel") is a U.S. citizen that resides in Glastonbury, Connecticut. Beginning in 2003, he was a Manager and subsequently Director of a unit within Pratt & Whitney that managed the relationship with its suppliers. Patel left Pratt & Whitney in March 2020. Patel is named in a criminal indictment issued by the DOJ for his role in the illegal No-Poach Agreement.

34.    Upon information and belief, Robert Harvey ("Harvey") is "Co-Conspirator 1" in the DOJ Affidavit. DOJ Affidavit ¶ 8(a). Beginning in 2010, Harvey was employed by QuEST as Senior Vice President, then President-Strategic Accounts, and, as of 2019, President-Global Business Head, and worked principally from an office in East Hartford, Connecticut. From 1998-2000, Harvey worked for Pratt & Whitney as a Senior Vice President. Harvey is named in a criminal indictment issued by the DOJ for his role in the illegal No-Poach Agreement.

35.    Beginning at least as early as 2007, Co-Conspirator 2 was employed by QuEST. He served as Engineering Director, General Manager starting in 2011, and in 2015, Associate Vice President, and worked principally from an office in East Hartford, Connecticut. DOJ Affidavit ¶ 8(b).

36.     Upon information and belief, Harpreet Wasan ("Wasan") is identified in the DOJ Affidavit as "Co-Conspirator 3." DOJ Affidavit ¶ 8(c). Beginning in early 2015, Wasan was Vice President Strategic Client Partner at QuEST, and worked principally from offices in East Hartford, Connecticut and Tokyo, Japan. He left QuEST in early 2021. Prior to his roles at QuEST, Wasan worked at Pratt & Whitney for approximately ten years. Wasan is named in a criminal indictment issued by the DOJ for his role in the illegal No-Poach Agreement.

37.     Beginning in late 2015, Co-Conspirator 4 was employed by QuEST as a General Manager and, as of 2018, Chief Engineer/Account Manager, and worked principally from offices in East Hartford and Windsor, Connecticut. He left QuEST in 2020. DOJ Affidavit ¶ 8(d).

38.     Upon information and belief, Steve Houghtaling ("Houghtaling") is identified as "Co-Conspirator 5" in the DOJ Affidavit. DOJ Affidavit ¶ 8(e). Beginning in early 2013, Houghtaling was employed by Belcan as a General Manager, Vice President, and, as of 2019, Senior Vice President, and worked principally from an office in Windsor, Connecticut. Houghtaling is named in a criminal indictment issued by the DOJ for his role in the illegal No-Poach Agreement.

39.     Upon information and belief, Tom Edwards ("Edwards") is identified as "Co-Conspirator 6" in the DOJ Affidavit. DOJ Affidavit ¶ 8(f). Beginning around 2010, Edwards was employed at the company now known as Cyient, and as of around 2013, has been President for Cyient's North America operations. He worked principally from an office in East Hartford, Connecticut. Edwards is named in a criminal indictment issued by the DOJ for his role in the illegal No-Poach Agreement.

40.     Upon information and belief, Gary Prus ("Prus") is identified as "Co-Conspirator 7" in the DOJ Affidavit. DOJ Affidavit ¶ 8(g). Beginning at least as early as 2015, Prus was Chief

Operating Officer/Executive Vice President and part owner of Parametric, and worked principally from an office in Jupiter, Florida. Earlier in his career, Prus worked for 18 years at Pratt & Whitney. Prus is named in a criminal indictment issued by the DOJ for his role in the illegal No-Poach Agreement.

41.     Upon information and belief, Frank O'Neil ("O'Neil") is identified as "Co-Conspirator 8" in the DOJ Affidavit. DOJ Affidavit ¶ 8(h). Beginning in 1993, O'Neil founded and was part owner of Agilis, and also served as President and Chief Executive Officer. He worked principally from an office in Palm Beach Gardens, Florida. O'Neil played a central role in the orchestration and enforcement of the illegal No-Poach Agreement.

42.     The DOJ Affidavit references Individuals 1 through 5 as witnesses that participated in or otherwise have knowledge of the illegal No-Poach Agreement. As of the date of this filing, their employment and job descriptions are redacted from the public version of the DOJ Affidavit.

## V.    TRADE AND COMMERCE

43.     During the Class Period, each Defendant, directly or through its subsidiaries or other affiliates, employed members of the proposed Class in Connecticut, Vermont, Massachusetts, Illinois, Ohio, Georgia, Florida, Puerto Rico, Kentucky, and throughout the United States, including in this District.

44.     During the Class Period, by reason of the illegal No-Poach Agreement hereinafter alleged, Defendants substantially affected interstate commerce throughout the United States and caused antitrust injury to Plaintiff and members of the Class.

## VI.    FACTUAL ALLEGATIONS

**A.    Background on the Market for Aerospace Engineering Services in the United States**

45.     As of May 2020, there were approximately 60,000 aerospace engineers in the United States, its territories, and the District of Columbia and tens of thousands of additional

Skilled Aerospace Workers including, for example, mechanical and civil engineers, engineering technicians, instrumentation technicians, quality technicians, machinists, welders, and mechanics. The median annual wage for an aerospace engineer during that same year was about $120,000.

46.     Skilled Aerospace Workers may be employed directly by companies that design and manufacture aircraft, spacecraft, satellites, and missiles ("Aerospace Firms"). They may also be employed by outsource engineering supply companies ("Suppliers") who enter agreements with Aerospace Firms to complete a particular project, often referred to as a Statement of Work. When brought on to complete an outsource work project, a Supplier assigns Skilled Aerospace Workers from among its own employees to complete that project and the Supplier collects an agreed-upon payment from the given Aerospace Firm.

47.     Pratt & Whitney, a subsidiary of Raytheon Technologies Corporation, is "one of the largest aerospace engine design, manufacture, and service companies in the United States." *See* DOJ Affidavit ¶ 5. It is a billion-dollar company with approximately 39,000 employees. Pratt & Whitney develops aircraft engines for civil (usually airlines) and military aviation. It is considered one of the big three aero-engine manufacturers.

48.     To meet its labor needs during the relevant period, Pratt & Whitney relied on both internal and external sources of labor to design, manufacture, and service its aerospace products. Its external sources of labor are arranged, in part, through agreements with Suppliers. Pursuant to the agreements, each Supplier would assign Skilled Aerospace Workers from its own employees to complete a particular project, and then would receive an agreed-upon payment from Pratt & Whitney for the work. Supplier Defendants "were among the Suppliers whose employees worked on projects for [Pratt & Whitney] on an outsource basis. Together with [Pratt & Whitney], these companies competed against one another to recruit and hire engineers and other skilled workers.

As Suppliers, they also competed against one another for outsource work projects from [Pratt & Whitney]." *Id*. at ¶ 6.

49.    Together with Pratt & Whitney, QuEST, Belcan, Cyient, Parametric, and Agilis competed against one another to recruit and hire Skilled Aerospace Workers. As Suppliers, they also competed against one another for outsource work projects from Pratt & Whitney, including on the basis of price. In a normal competitive labor market, these Suppliers would compete to recruit and hire the most talented employees with better compensation, wages, and benefits.

**B.    Defendants' Illegal No-Poach Agreement**

**1.    Department of Justice Investigation and Criminal Indictments.**

50.    The No-Poach Agreement was exposed on December 9, 2021, when DOJ partially unsealed a criminal antitrust action against the Director of Global Engineering Sourcing at Pratt & Whitney, Patel. In a supporting affidavit, the DOJ alleged that Patel conspired with the Supplier Defendants to restrict the hiring and recruiting of Skilled Aerospace Workers with the goal and effect of suppressing their compensation wages. *See* DOJ Affidavit ¶¶ 13-14.

51.    According to the DOJ Affidavit, Patel executed the conspiracy by confronting and berating Supplier Defendants that cheated the No-Poach Agreement, often at the behest of another Supplier Defendants. He also threatened to punish nonconforming Supplier Defendants by taking away valuable access to projects. *Id*. at ¶¶ 26-34.

52.    Shortly after unsealing of the criminal complaint against Patel, a December 15, 2021 DOJ Indictment specifically named six executives and managers—Patel, Harvey, Wasan, Houghtaling, Edwards and Prus—and alleged each conspired through the No-Poach Agreement in a scheme that affected thousands of Skilled Aerospace Workers. *See* DOJ Indictment ¶ 19.

53.    In announcing the DOJ Indictment, Assistant Attorney General Jonathan S. Kanter of the DOJ's Antitrust Division said, "Our investigation revealed a prolonged and widespread

scheme to deprive aerospace workers of the ability to plan their own careers and earn competitive pay."[2]

54.     Federal prosecutors said in the DOJ Indictment that Defendants and their co-conspirators recognized a mutual benefit of the conspiracy: reducing the rise in labor costs that would occur when aerospace workers were free to find new employment in a competitive market. *Id*. at ¶ 27.

### 2.    Defendants' Anticompetitive Scheme.

55.     Over a period spanning at least 2011 through September 2019, Pratt & Whitney, QuEST, Belcan, Cyient, Parametric, and Agilis formed a Conspiracy to reduce and limit compensation and mobility of Skilled Aerospace Workers. The No-Poach Agreement was executed in at least three ways. First, outright restrictions on the hiring of one another's Skilled Aerospace Workers. Second, tenure restrictions and hiring freezes directed at Skilled Aerospace Workers. And third, the collusive enforcement of non-compete provisions in Skilled Aerospace Workers' employment contracts.

56.     The Conspiracy was executed, enforced, and concealed by the Defendants' most senior executives and managers, including Patel at Pratt & Whitney, and others, including, over the course of the conspiracy, Harvey, Wasan, Edwards, Prus, O'Neil, and Co-Conspirators 2 and 4. All agreed to allocate employees in the labor market in the aerospace industry, specifically by agreeing to restrict the hiring and recruiting of Skilled Aerospace Workers between and among

---

[2] Press Release, Six Aerospace Executives and Managers Indicted for Leading Roles in Labor Market Conspiracy that Limited Workers' Mobility and Career Prospects (Dec. 16, 2021) https://www.justice.gov/opa/pr/six-aerospace-executives-and-managers-indicted-leading-roles-labor-market-conspiracy-limited

Pratt & Whitney, QuEST, Belcan, Cyient, Parametric, and Agilis in the United States. Patel served as the leader and primary enforcer of this agreement.

57.    The origin of this No-Poach Agreement lies in the common interest of Pratt & Whitney and Supplier Defendants to restrict the movement of employees from Supplier to Supplier, which movement resulted in increased wages. Beginning as early as 2011, certain Supplier Defendants that shared Pratt &Whitney as a mutual customer reached agreements to restrict the hiring and recruiting of Skilled Aerospace Workers between and among them.

58.    Around the same time, evidence shows Patel was aligned with and actively engaged in the Conspiracy. Supplier managers and executives frequently requested that Patel interject as an enforcement measure when other Supplier Defendants were violating the No-Poach Agreement. In turn, Patel deployed his enforcement power to ensure compliance, as discussed *infra*.

### 3.    Patel Orchestrated and Enforced the No-Poach Agreement.

59.    Patel served as the orchestrator and enforcer of the No-Poach Agreement between QuEST, Belcan, Cyient, Parametric, and Agilis. At times, when infractions of the No-Poach Agreement occurred, a Supplier Defendant alerted Patel to the violation and requested that he assist in preventing or deterring such conduct. Patel often responded to these requests by reprimanding the uncooperating party. Indeed, Patel explicitly told Supplier managers and executives that Pratt & Whitney's Suppliers should not be recruiting and hiring each other's employees. The Supplier Defendants, in turn, understood that these restrictions applied mutually among themselves.

60.    For example, when Cyient attempted to hire an employee from QuEST, the hiring prompted a QuEST representative to email Patel and say, "This is against our agreements with our employees and against our known expectations of [Pratt & Whitney] for the cooperation of the

outsource companies." The next day, executives from Cyient and QuEST were invited to a meeting in Patel's office for a "private discussion." DOJ Affidavit ¶ 25.

61.    When Supplier Defendants learned of potential breaches of the No-Poach Agreement, they made it their practice to notify Patel. In or around February 2015, after Cyient hired one of QuEST's employees, Edwards e-mailed another Cyient executive stating, "I let Mahesh know that this happened – [a]nd we are still looking into how exactly this happened." Edwards asked the other Cyient executive, "can you let Mahesh know the actions we're taking to prevent this from happening again?" DOJ Indictment ¶ 25(c).

62.    Patel assumed a direct role and authorized specific actions in furtherance of the Conspiracy. For example, in or around December 2015, Pratt & Whitney convened a dinner attended by Patel and representatives from QuEST, Belcan, and Cyient, including Wasan, Edwards, and Co-Conspirator 4. Individual 1, an executive of Belcan who also attended the dinner, sent an email to Houghtaling and other Belcan employees summarizing statements made by Patel during the dinner as he addressed the Supplier representatives. The e-mail states, "Mahesh did take the stage at the end . . . no poaching of each others' [sic] employees." DOJ Indictment ¶ 22(a).

63.    In May 2016, Belcan Vice President Houghtaling was informed by a colleague that "[a]nother employee" had been hired by Parametric to work on outsourcing a project. The colleague asked Houghtaling if he "ever discuss[ed] the last one with Mahesh?" Houghtaling assured the colleague that he had spoken to Patel and that Patel had "said he'd talk to [Parametric] about it." Houghtaling subsequently emailed Patel to complain that his company was "losing another employee to [Parametric]," and named the employee. DOJ Indictment ¶ 22(c).

64.    An internal September 2016 Belcan email indicates that a Belcan executive alerted Patel to a recent incident of poaching by Parametric.  Patel then sent an email to Prus, referencing

Belcan and stating: "<u>You had assured me</u> that [Parametric] will never soliciting [sic] [Pratt & Whitney's] long term partners [sic] employees. . . . Please send me in writing that proper steps has [sic] taken place to curtail this practice." (Emphasis in original.) Prus revealed, in a subsequent email, that he understood Belcan was the source of the complaint: "Belcan is making a big stink right now over any solicitations." In response to Patel's reprimand, Prus e-mailed Individual 5, a Parametric employee, instructing them to "[p]lease stop speaking to any [Belcan] or other [Pratt] supplier companies about transitioning to a [Parametric] Office immediately." Individual 5 wrote back "[c]onsider it done." DOJ Affidavit ¶ 31.

65.    Two months later, in November 2016, Prus wrote to another executive at Parametric: "Need to have a conversation with [a Belcan manager] about them actively recruiting [Parametric] employees. We do not EVER call their employees." Later that day, the Parametric executive responded to Prus: "I talked to him. He will talk to recruiting . . . ." DOJ Indictment ¶ 28(g).

66.    Nevertheless, Prus also involved Patel, writing him an e-mail to complain about "Belcan actively Recruiting [sic] [Parametric] employees." Patel forwarded Prus's email to Houghtaling and another Belcan manager, saying "[w]e must not poach each other [sic] partners [sic] employee [sic]. Please communicate to [Belcan] HR not to interview or hire active employees working on [Pratt & Whitney] work." DOJ Indictment ¶ 22(d).

67.    Similarly, in January 2017, after a Cyient executive sent an e-mail to Patel complaining of "[Parametric] stealing our people" and naming a Cyient employee who had been offered employment by Parametric, Patel forwarded the e-mail to Prus (Parametric), stating: "Last time we talked you assured me that you will not hire any [Pratt & Whitney] partners [sic] employee [sic]. This must stop, otherwise others will also start poaching your employees." Prus subsequently

forwarded the e-mail to Individual 5, a Parametric recruiting employee, and said, "Please make sure we stay away from [Belcan], [Cyient], [Agilis] personnel moving forward." DOJ Indictment ¶ 25(b).

68.     In or around February 2017, Wasan responded to news that Belcan had made an employment offer to a QuEST engineer, stating in an e-mail: "[Belcan] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." Approximately four minutes later, Wasan forwarded the information about Belcan's offer directly to Patel, adding, "I am very concerned that [Belcan] believes they can hire any of our employees . . . . Could you please stop this person from being hired by [Belcan]?" DOJ Indictment ¶ 28(b).

69.     In or around December 2017, a QuEST Vice President e-mailed Houghtaling to complain about Belcan's employment offers to two QuEST employees in Illinois, stating, "I would like to understand if you are planning to address this immediately, or I will be forced to escalate to our mutual customers." Harvey immediately responded, stating, "Spot on. This cannot be tolerated! We need to move quickly and forcibly when this is about to happen." Later, he added, speaking to QuEST's management and executive team: "Push hard to have it reversed and consequences for [Belcan]." DOJ Indictment ¶ 28(f).

70.     In June 2018, a recruiter at Belcan explained in an internal email, eventually forwarded to Houghtaling and other Belcan managers and executives, that "[QuEST] complained to [Pratt & Whitney] that we are 'stealing' their people, and [Pratt & Whitney] threatened to pull all POs from [Belcan] if we hire him." A day later, a Belcan employee e-mailed Patel and said, "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter" to the engineer from QuEST. DOJ Affidavit ¶ 33.

71.     Additionally, in or around September 2019, after learning that Agilis had hired employees from Cyient, Edwards (Cyient) e-mailed O'Neill (Agilis) to request adherence to the No-Poach Agreement. Edwards stated, "I wanted to ask if your team could refrain from actively recruiting our [Cyient] employees going forward," and assured O'Neill that, "I flat out ask our teams not to hire people from other [Pratt & Whitney] suppliers." O'Neill assured him, "Our general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt." DOJ Indictment ¶ 27(a).

**4.      Pratt & Whitney Further Restricted Hiring.**

**a.      The Two-Year Tenure Restriction**

72.     Patel also agreed with QuEST employees to restrict Pratt & Whitney's hiring and recruiting of Skilled Aerospace Workers from QuEST, through two primary means. The first method was not hiring QuEST's employees unless they had worked at QuEST for a certain length of time.

73.     In September 2011, Harvey and Individual 1 attended a dinner with Patel and a Pratt & Whitney Vice President to whom Patel directly reported to discuss that and other issues. Harvey sent an email to the dinner group the following day, stating, "We truly appreciate and value our strategic relationship. I thought I would take the lead in summarizing what we discussed last night and proposed next steps . . . " First on that list was "Personnel Transfers" (in quotations in the original email), which Harvey described as "the new policy/guidelines" that the Pratt & Whitney Vice President had reviewed at the dinner. The new policy related to a "min. 24 months" for such "Personnel Transfers." Harvey further indicated that Patel had advised to minimize the written record on that issue: "Following Mahesh's previous counsel, I am not going into detail in writing on this subject." DOJ Affidavit ¶ 42.

74.     Beginning in late 2011, from time to time, Harvey and other managers and executives from QuEST communicated with Patel, and vice versa, in order to reconfirm, maintain, and enforce this agreement and block or attempt to block the recruiting and hiring of certain QuEST employees by Pratt & Whitney. While occasionally these communications went through employees working under Patel in his outsourcing management group at Pratt & Whitney, Patel was the central communicator and decision-maker for Pratt & Whitney regarding this agreement.

75.     As an example, in October 2012, Individual 1 responded to Patel by email after receiving a voicemail from Patel regarding a QuEST employee: "[Employee]'s tenure at [QuEST] dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [Pratt & Whitney] not pursue employment of [him] at this time." DOJ Affidavit ¶ 44.

76.     Patel continued his communications with others at QuEST concerning the two-year tenure agreement. As an example, in June 2015, Patel emailed Wasan and two other QuEST managers, stating that Pratt & Whitney "is interested in interviewing and hiring" two QuEST employees, "[p]lease provide your concurrence." One of the QuEST managers responded to Patel that one of the individuals in question had worked at QuEST for four and a half years, and thus "meets requirements," but the other "only has 8 months and does not meet obligation, so [QuEST] cannot provide concurrence." DOJ Affidavit ¶ 45.

77.     As another example, in April 2017, a QuEST manager noted in an internal email to another QuEST manager that he had received a notice from Pratt & Whitney that it wanted to hire a particular QuEST employee, but he "wouldn't meet our requirements for two years." Two days later, the same manager emailed Patel and stated that the employee "does not meet tenure requirements." Patel then told a Pratt & Whitney Human Resources employee: "[QuEST] will not release him... He has not completed 2 [y]ears as our verbal agreements." DOJ Affidavit ¶ 46.

### b.      The Hiring Freezes

78.     From 2015 through 2017, Patel and representatives of QuEST discussed and agreed upon further restrictions on the hiring and recruiting of QuEST employees by Pratt & Whitney, namely by agreeing upon periods of time in which Pratt & Whitney agreed not to recruit or hire any QuEST employees, with limited exceptions. These periods of time were often referred to as hiring "freezes" or "moratoria." DOJ Affidavit ¶ 47.

79.     Each hiring freeze began by QuEST managers and executives lobbying Patel to restrict or cease hiring from QuEST. As an example, in September 2015, Patel emailed three QuEST employees, including Wasan, asking for the company's "concurrence" in Pratt & Whitney's hiring of two named QuEST engineers. Wasan responded to Patel at length, complaining about the recent increase in Pratt & Whitney's hiring. While Wasan agreed that both of the employees in question "have at least two years [QuEST] experience, so [they] meet the 'handshake agreement' level" he stated "[QuEST] will not be able to concur with any more hiring of [QuEST] employees this year. . . . All we can do is highlight the problem and ask that [Pratt & Whitney] support us going forward to prevent further hiring of our resources." In a follow-up email, Harvey added, addressing Patel directly, "Mahesh, we truly need your help in blocking these two hires and putting a moratorium on [QuEST] hires for the remainder of the year." DOJ Affidavit ¶ 48.

80.     As another example, in January 2016, Patel and Wasan worked together to establish a new hiring freeze for 2016. Wasan reported to Co-Conspirator 4 and another colleague, "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell him that he needs to block" two QuEST engineers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team." DOJ Affidavit ¶ 49.

81.     Patel also announced the hiring freezes to other Pratt & Whitney personnel involved in recruiting and hiring Skilled Aerospace Workers, and directed them to comply with it. As an example, in an early September 2017 email to the Vice President of Human Resources-Engineering, Patel requested that she "direct your HR team not to hire [QuEST] outsource resources currently deployed on [Pratt] projects till end of this year….[QuEST] senior leadership including CEO has repeatedly raised concerns on [Pratt] hiring [QuEST] employees. We will lift [QuEST] hiring restriction from Jan 1, 2018." DOJ Affidavit ¶ 50.

82.     DOJ's investigation revealed a potential financial quandary that QuEST and Pratt & Whitney faced with respect to the latter's hiring from the former: it was difficult for QuEST to simultaneously maintain low prices to its customer, Pratt & Whitney, and compete with Pratt & Whitney's higher wages. Thus, by agreeing to curb Pratt & Whitney's recruiting and hiring from QuEST, when otherwise many QuEST engineers would be leaving in favor of higher wages and other benefits that Pratt & Whitney offered, Patel helped alleviate upward pressure on costs to both companies.

83.     Consistent with this shared interest, as part of QuEST's lobbying of Patel to agree to the hiring freezes, QuEST appealed to the financial benefits that would accrue to both QuEST and Pratt & Whitney if Pratt & Whitney ceased recruiting and hiring QuEST engineers, including by resisting wage increases. As an example, in June 2017, QuEST's President, Harvey, made a business proposal to the parent company of Pratt & Whitney, which was forwarded to Patel. The proposal requested hiring restrictions between Pratt & Whitney and QuEST. As Harvey explained, it provided a "partnership approach on how we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services to" Raytheon, Pratt & Whitney's parent company. In the attached presentation, Harvey explicitly requested further hiring restrictions

between the two companies, given that "We have found that customer hiring of our resources puts pressure on [QuEST]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time." DOJ Affidavit ¶ 52.

### 5. Defendants Were Fully Aware Their Conduct Was Unlawful

84.     At least as early as January 2016, managers and executives at Belcan began raising concerns with Patel that the conduct of the Defendants was unlawful. Specifically, they addressed the illegality of their actions in light of the antitrust laws.

85.     In January 2016, a General Manager for Belcan received an email describing a civil lawsuit in which several major companies were accused of "engaging in illegal antipoaching agreements……the companies involved had promised each other not to actively recruit employees from one another." DOJ Affidavit ¶ 35. The General Manager then scheduled a meeting with Patel, including as an item "[i]nformal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal" (an apparent reference to the 2015 settlement in *In re High-Tech Employee Antitrust Litig.*, No. 5:11-cv-2509 (N.D. Cal.)). *Id.*

86.     Concerns about the unlawful nature of the No-Poach Agreements arose again in February 2017. In a series of emails, Belcan's Human Resources Director and the General Manager discussed the No-Poach Agreement and hiring practices of Defendants. The HR Director noted her concern that "there is an anti-trust issue by us turning people away solely based on their previous employer." *Id.* ¶ 37. The General Manager agreed, noting "[P&W] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . . I'm not sure if this is legal, but that is what they are requesting we do." *Id.* Despite being made aware of Belcan's concerns, Patel continued to enforce the No-Poach Agreement and no Defendant ceased complying.

87.    Belcan internal emails after a call with Patel stated: "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors." *Id*. Two weeks later, a Belcan employee sent an email to the Belcan HR Director, the General Manager, and the Vice President of Human Resources. The sole content of the email was a link to a website that described a class action antitrust lawsuit concerning a "conspiracy" between companies who had agreed to "restrict[ ] recruiting of each other's employees." *Id*. ¶ 38.

88.    Despite knowing that these agreements violated the antitrust laws, and despite being involved in government contracting, Defendants at no point reported their antitrust violations to the proper authorities and continued to conceal their No-Poach Agreements from Plaintiff, Class members, and the public at large.

**6.    Plus Factors Render the Aerospace Engineering Industry Susceptible to Collusion.**

89.    In addition to the extensive record of direct evidence of the No-Poach Agreement among Defendants, there are several plus factors that demonstrate why the market for Skilled Aerospace Workers in susceptible to collusion, including (1) numerous opportunities to collude; (2) entry and exit barriers; and (3) a common motive to conspire.

90.    ***Opportunities to Collude***. Defendants had a very close personal relationship, offering numerous opportunities to collude. As discussed above, Defendants had direct lines of communications with each other, which involved emails, phone conversations, and even in-person meetings where the subject was the No-Poach Agreement itself.

91.    For example, Patel held a dinner in December 2015 with representatives of QuEST, Belcan, and Cyient where he directly told attendees that they should not poach each other's employees. Patel held another dinner with representatives from QuEST in 2011 to discuss the No-

Poach Agreement. Emails also indicate that Belcan's Houghtaling planned to hold a meeting with Patel to discuss the No-Poach Agreement with the following agenda item: "Informal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal." DOJ Affidavit ¶ 36.

92.     Other opportunities to conspire include the Defendants' participation in trade associations and trade conferences. For example, Patel and Belcan Senior Vice President Houghtaling are Co-Chairs of the International Association of Outsourcing Professionals' (IAOP) Engineering and Technology Services chapter. The chapter has existed since at least January 2012 and meets quarterly. Raytheon (parent company of Pratt & Whitney) and Belcan are also both members of the Aerospace Industries Association (AIA).

93.     There were also events, hosted by Pratt & Whitney, where Defendants were able to get together and further facilitate the No-Poach Agreement. For example, Pratt & Whitney hosts an annual "Supplier Summit" where it offers awards in various categories to its suppliers. In 2019, Cyient won the "Supplier Innovation Award" and the "Supplier Highest Productivity Award," because, as Cyient boasted, it was able to deliver "cost savings."

94.     ***Barriers to Entry***. Skilled Aerospace Workers typically require at least a bachelor's degree in an engineering or related field. Skilled Aerospace Workers must make substantial investments of time and money into their education and training to acquire the highly specialized skill necessary to perform work at these Firms. In addition, significant portions of the aerospace industry—because they involve defense or other governmental projects—require work to be done in the United States by U.S. citizens.

95.     Further, a barrier to exit exists because application of the skill sets required of Skilled Aerospace Workers are not directly transferable to other fields. The substantial investments

of time and money in obtaining education, training, and experience, in turn, constitute barriers to exit once they have been obtained.

96.     ***Motive to Conspire***. By agreeing to refrain from competing for each other's Skilled Aerospace Workers, Defendants were able to restrain those employees from moving from one Defendant to another. Restrictions on employee mobility reduce competition for labor and, as a result, enable employers to suppress compensation and thereby reduce their labor costs. Relatedly, restricting employee mobility reduces employee turnover and its attendant costs. In addition, higher compensation for employees may have led each Supplier Defendant to quote or seek to charge higher prices to Pratt & Whitney for any projects, which may have resulted in an unsuccessful bid. For its part, Pratt & Whitney was able to outsource projects at lower cost because of the reduced bids from the other Defendants. As a result, Defendants had sufficient motive to reach an agreement not to hire or poach employees from each other.

## C.     Anticompetitive Effects and Injury Suffered by Class Members from Defendants' Illegal No-Poach Agreement

97.     Because of the No-Poach Agreement, Plaintiff and Class members have suffered injury in the form of restricted and reduced mobility and suppressed wages.

98.     Defendants' Conspiracy suppressed Plaintiff's and the Class members' compensation and restricted competition in the labor market in which Plaintiff and the other Class members sold their services. It did so through schemes to restrict hiring and recruiting of Defendants' employees.

99.     As a result of Defendants' anticompetitive conduct alleged herein, the compensation of Skilled Aerospace Workers in the United States were fixed, stabilized, or maintained at artificially depressed levels during the Class Period.

26

100.    Because of their anticompetitive effects, no-poach agreements among competitors have always been illegal under the antitrust laws. In October 2016, the DOJ's Antitrust Division and the Federal Trade Commission issued Antitrust Guidance for Human Resource Professional ("Antitrust Guidance").[3] As part of the announcement, the Antitrust Division's Acting Assistant Attorney General explained that "[a]ntitrust violations in the employment arena can greatly harm employees and impact earnings over the course of their entire careers." Indeed, DOJ made clear that "no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."

101.    Suppressed wages due to employers' agreement not to compete with each other is injury of the type the antitrust laws were intended to prevent and flows from that which makes the No-Poach Agreement illegal.

## VII.    CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

> All Skilled Aerospace Workers employed by Defendants, their subsidiaries and/or related entities in the United States from January 1, 2011 until at least September 2019.

103.    Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants. Plaintiff reserves the right to modify or amend the Class definitions,[4] as appropriate, during this litigation.

---

[3] *See* Department of Justice Antitrust Division and Federal Trade Commission, Antitrust Guidance for Human Resource Professionals (Oct. 2016), available at https://www.justice.gov/atr/file/903511/download.

[4] Skilled Aerospace Workers will be further defined upon Plaintiffs' analysis of discovery materials.

104.    **Numerosity. Fed. R. Civ. P. 23(a)(1).**  The members of the Class are so numerous that the joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, the DOJ has stated that thousands of Skilled Aerospace Workers were victimized by Defendants' No-Poach Agreement.

105.    **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** There are numerous questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

(a)    Whether Defendants entered into, operated, monitored and enforced the No-Poach Agreement;

(b)    Whether Defendants concealed the existence of the No-Poach Agreement from Plaintiff and Class members;

(c)    Whether Defendants' conduct violated Section 1 of the Sherman Act;

(d)    Whether Defendants' No-Poach Agreement is a *per se* violation of the Sherman Act;

(e)    Whether Defendants' No-Poach Agreement restrained trade, commerce, and/or competition for Class members between Defendants; and

(f)    Whether Plaintiff and Class members suffered antitrust injury as a result of the Defendants' actions, and if so, the extent of monetary damages.

106.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claim is typical of those of other Class members because Plaintiff was employed by Defendant Pratt &Whitney as an Engineer during the relevant period. Plaintiff's claim is based upon the same legal theories as those of the other Class members. Plaintiff and other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendants engaged.

107.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's interests also

do not conflict with the interests of the other Class members who he seeks to represent. Plaintiff's counsel are competent and experienced in litigating antitrust class actions, including litigation regarding hiring, recruiting, and no-poach agreements.

108.    **Superiority of Class Action. Fed. R. Civ. P. 23(b)(3):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no inordinate difficulty in the management of this action as a class action.

109.    All members of the proposed Class are readily ascertainable. Defendants' employment records will identify Class members with addresses and other contact information for the thousands of members of the Class, which can be used for providing notice.

110.    Damages for any individual Class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

## VIII.   PLAINTIFF'S CLAIMS ARE TIMELY

111.    Plaintiff and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the No-Poach Agreement alleged herein until December 9, 2021, when the DOJ partially unsealed a criminal antitrust complaint against Patel. Prior to this, Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to restrain competition in order to suppress the compensation of Defendants' workers.

112.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor communications on documents, and concealing the existence and nature of their discussions from non-conspirators (including Class members).  The Conspiracy was by its nature self-concealing.

113.    As detailed by the DOJ Indictment, Defendants and co-conspirators took steps to conceal the existence and operation of the Conspiracy, including by:

(a)    minimizing written discussions about the agreement and dissemination thereof;

(b)    agreeing that the conspiratorial agreement will remain an unwritten understanding and not reflected in master terms agreements or other formal, written agreements between Pratt & Whitney and co-conspirators;

(c)    holding and participating in meetings and discussions about the agreement in private, with limited audiences; and

(d)    providing false and misleading information to Skilled Aerospace Workers regarding the existence of the No-Poach Agreement and the workers' ability to obtain employment at other co-conspirator companies, including by communicating that employment at other co-conspirator companies was unavailable to them because of noncompete agreements rather than conspiratorial agreement.

114.    One example of this is a September 2011 e-mail from Harvey to Patel and co-conspirators, where Harvey stated, "Following Mahesh's previous counsel, I am not going into detail in writing" on the subject of the No-Poach Agreement. DOJ Indictment ¶ 29(e).

115.    Similarly, in a January 2015 statement by a QuEST manager to Harvey and two other QuEST executives regarding a recent discussion with Houghtaling about ceasing poaching between QuEST and Belcan, the QuEST manager stated: "While I wanted you to be informed, I would rather not have any other folks know where this info came from. I request that this email not be forwarded." DOJ Indictment ¶ 29(f).

116.    Another example is the April 2017 email from Patel for an invitation for a "private discussion" in his office to two QuEST managers, as well as Edwards and another manager from Cyient, following a complaint of poaching that QuEST made to Patel about Cyient. DOJ Indictment ¶ 29(g).

117.    Before December 9, 2021, Plaintiff reasonably considered hiring in the aerospace industry to be competitive.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' hiring practices.

118.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

119.    Plaintiff exercised reasonable diligence.  Plaintiff and the members of the Class could not have discovered the alleged Conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

120.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended

with respect to any claims and rights of action that Plaintiff and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

### IX.    CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1

121.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

122.    Plaintiff brings this action individually and on behalf of all Class members.

123.    Beginning no later than 2011, and continuing until at least 2019, Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

124.    Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing, and stabilizing the wages, benefits and other aspects of compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for labor.

125.    As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

126.    The illegal No-Poach Agreement among Defendants and their co-conspirators have had the following effects, among others:

    a.    Competition among Defendants for labor has been suppressed, restrained, and eliminated; and

    b.    Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of the No-Poach

Agreement and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

127.     The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

128.     Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

129.     Accordingly, Plaintiff and Class members are entitled to three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## REQUEST FOR RELIEF

130.     WHEREFORE, Plaintiff, on behalf of himself and the Class of all others so similarly situated, respectfully requests judgment against Defendants as follows:

131.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

132.     The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

133.     Plaintiff and the Class recover damages, to the maximum extent allowed under the Sherman Act, and that a joint and several judgment in favor of Plaintiff and the members of the

Class be entered against Defendants in an amount to be trebled;

134. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

135. Plaintiff and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

136. Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

137. Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

138. Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


DATED: January 27, 2022                    Respectfully submitted,

                                           By: /s/ Jonathan M. Shapiro
                                           Jonathan M. Shapiro (ct24075)
                                           AETON LAW PARTNERS LLP
                                           311 Centerpoint Drive
                                           Middletown, CT 06457
                                           Tel: (860) 724-2160
                                           jms@aetonlaw.com

R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel. (415) 217-6810
rick@saveri.com
cadio@saveri.com

Daniel R. Karon
KARON LLC
700 W. St. Clair Ave., Ste. 200
Cleveland, OH 44113
Tel. (216) 622-1851
dkaron@karonllc.com

*Counsel for Plaintiff Paul Strong and the Proposed Class*